IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

---oOo---


ELIZABETH SANCHEZ, for
herself and on behalf of
those similarly situated,

        Plaintiffs,       No. Civ. S-06-2573

vs.


WAL-MART STORES, INC.,
DOREL JUVENILE GROUP,
INC.; and DOES 1 through
25, inclusive,

        Defendants.

_____/


---oOo---

REPORTER'S TRANSCRIPT

MOTION FOR CLASS CERTIFICATION

WEDNESDAY, MAY 13, 2009

---oOo---




Reported by:     KELLY O'HALLORAN, CSR #6660

                              APPEARANCES




  For the Plaintiff:


        LAW OFFICES OF CLAYEO C. ARNOLD
        865 Howe Avenue, Suite 300
        Sacramento, CA  95825
        BY:  KIRK J. WOLDEN

        LEVY, RAM & OLSON LLP
        639 Front Street, Fourth floor
        San Francisco, CA  94111
        BY:  MICHAEL F. RAM

  For the Defendant:

        SCHIFF HARDIN LLP
        6600 Sears Tower
        233 South Wacker Drive
        Chicago, IL  60606
        BY:  WILLIAM E. MEYER

        SCHIFF HARDIN LLP
        One Market, Spear Street Tower
        Thirty-Second Floor
        San Francisco, CA  94105
        BY:  VALERIE L. GREEN

```
 1                      SACRAMENTO, CALIFORNIA

 2              WEDNESDAY, MAY 13, 2009, 9:30 A.M.

 3                          ---oOo---

 4          THE CLERK:  Civil 06-2573; Sanchez versus Wal-Mart

 5     Stores, Incorporated, et al.

 6          Counsel starting with plaintiffs state their

 7     appearance, please.

 8          MR. WOLDEN:  Kirk Wolden for plaintiffs.

 9          MR. RAM:  Michael Ram for the plaintiffs, your Honor.

10          MR. MEYER:  Good morning, your Honor.  Bill Meyer and

11     Valerie Green on behalf of the defendants.

12          THE COURT:  No Mr. Arnold this morning?

13          MR. WOLDEN:  No, your Honor.

14          THE COURT:  Okay.  Is there a reason?  One of the

15     first decorations I read in this case indicated that he was

16     going to be the lead counsel.  Has that changed?

17          MR. WOLDEN:  At trial, your Honor.  This is certainly

18     my case in terms of its day-to-day responsibility, and I've

19     been responsible for the vast majority of the work conducted

20     to date.

21          THE COURT:  Okay.  All right.  Let me begin with the

22     parties' initial discussion about this motion with the Court

23     about the possible need for live testimony.  And I responded

24     to that by way of a minute order indicating I didn't think it

25     was necessary, and if I changed my mind, I would let the
```

1     parties know.  I haven't changed my mind.  This is without

2     question one of the most extensively briefed certification

3     motions I've ever seen.  For purposes of the record, I'll

4     indicate I have a motion to strike along with the motion to

5     certify the class.  Just the briefs alone with respect to

6     those two motions are close to 300 pages.  This case was

7     filed, fortunately for the lawyers, unfortunately for me,

8     before my scheduling order limiting briefs to 25 pages was

9     issued.  I recognize that it did not apply to the parties

10    when these briefs were filed.  It's going to apply from this

11    point forward, just so all of you know.  Briefs will not

12    exceed 25 pages, and reply briefs will not exceed ten pages.

13         When I add to just the briefs themselves the

14    declarations and the exhibits from both sides, we're up close

15    to 1,500 pages of material.  And I want to assure the lawyers

16    that somehow, in some way, because this is obviously an

17    important motion, we reviewed it, including the videotape

18    that plaintiffs submitted as part of an exhibit for

19    Mr. Manning.  So we got through it.  But because of that, the

20    point of this is I don't need testimony.  And it's not in any

21    way going to assist the Court given, to both sides' credit,

22    the detail that you provided to me in writing and on video.

23    So it wasn't plaintiffs who requested that.  I recognize

24    that.  It was the defense that really wanted the Court to

25    consider having live testimony.  And for purposes of the

1    record, I find it unnecessary and affirm my minute order that

2    I will not have any live testimony.

3         All right.  Having said that, I want to take up first

4    the motion to strike that was filed by the defense.  They're

5    asking me to strike two declarations.  And Mr. Meyer, let me

6    ask, there was a second declaration submitted by Mr. Kitzes,

7    K-I-T-Z-E-S, as part of the reply.  Does your motion to

8    strike include that declaration as well or any portion

9    thereof?

10        MR. MEYER:  Your Honor, that certainly is a good

11   question.  And I have to tell you that I have not reflected

12   upon that question.  And I apologize for that, your Honor.

13   But let me take a very quick look at Mr. Kitzes' second

14   declaration.  My best recollection is it doesn't change what

15   are the critical facts here about Mr. Kitzes, which is that

16   he is just a lawyer who is giving a legal conclusion about

17   the misbranding of a hazardous substance that he's not

18   competent to give.  The fundamental issue about Mr. Kitzes is

19   only the CPSC can declare a substance as a misbranded

20   hazardous substance.  He can't do that.  It's an issue for

21   the CPSC.  His testimony isn't helpful.  And therefore it

22   should be disregarded.

23        THE COURT:  Tell me how, staying on that issue for a

24   second, tell me how you believe Mr. Kitzes' declaration

25   differs from Mr. Gidding's declaration.  I was somewhat

1    surprised to see that given your objection to Mr. Kitzes',

2    although I know it's difficult when you have a declaration

3    like that not to respond to it, and I understand, in part,

4    that was the purpose of Mr. Gidding.  But Mr. Gidding talks a

5    lot about the Consumer Product Safety Act, and he's a lawyer

6    as well.  So tell me what you see is the difference between

7    these two declarations and why I shouldn't strike both of

8    them.

9        MR. MEYER:  Your Honor, there is one key difference.

10   And absolutely, your Honor, you're right in the first

11   instance that in order to protect our record, we have to have

12   a responsive declaration.  That being said, though, the

13   important distinction about our expert, Mr. Manning's

14   opinion, is that what he does is --

15       THE COURT:  I'm only focusing on Gidding and Kitzes

16   right now.

17       MR. MEYER:  He points out to -- excuse me -- Gidding,

18   is that he points out to the Court from his experience that

19   you don't get to that conclusion of hazardous substance

20   unless that's what the CPSC does.  He's not saying that it is

21   or it isn't.  He's not putting himself into the role of the

22   regulator, but he's pointing out to the Court from his

23   experience in that area that that's an improper thing for

24   Mr. Kitzes to do.  And I think that's the distinction.  I

25   think your Honor is very much on the right course, that if we

1    don't have Kitzes, we don't need Gidding.

2          THE COURT:  So, for example, in the second declaration

3    of Mr. Kitzes, it's actually document 168 on our docket, he

4    makes statements such as he talks about Section 25(a) and (b)

5    of the Consumer Product Safety Act and makes a statement that

6    "Section 25(a) states that compliance with commission rules

7    or orders does not relieve manufacturers from liability at

8    state or common law."  And, "Further, 25(b) prevents the

9    admission into evidence at trial, at state or common law, the

10   failure of the commission to take action or to commence a

11   proceeding with respect to the safety of a consumer product."

12   And then in paragraph 5, he says, "Manufacturers must comply

13   with the FHSA and CPSC rules regardless of whether the

14   commission has taken action."

15         Are statements like that, in your view, objectionable?

16   Because statements like that seem to me very similar to the

17   statements made by Mr. Gidding.  And so I'm trying to

18   determine what it is exactly you're asking me to strike.  Are

19   you asking me to strike the entire declaration or only

20   portions of the declaration?

21         MR. MEYER:  Well, your Honor, I think it's fair to say

22   that declarations of that nature, really Mr. Kitzes is

23   telling the Court what the law is.  The Court is in the

24   position obviously to do that for itself.  I think really to

25   cut to the chase, your Honor, that Mr. Kitzes' testimony

1    overall should be stricken in its entirety.  And if that

2    occurs, then the responsive testimony of our expert becomes

3    unnecessary.  But, you know, exactly, your Honor, those kind

4    of statements, what's happening there is that he is making

5    conclusions of law that are appropriate for the Court to

6    make.  That's the Court's role.

7         THE COURT:  Okay.  Mr. Wolden, let me ask you.  I

8    wasn't necessarily convinced with your trying to distinguish

9    this declaration from the declaration in the case cited by

10   the defense involving Mr. Kitzes in which his testimony was

11   stricken.  I want to give you another chance to address that

12   issue, but I didn't see a lot of difference between this

13   declaration and that declaration discussed in that case.

14        MR. WOLDEN:  Well, in substantial part, there's no

15   difference between them.  And our point, your Honor, is that

16   at this juncture of the proceedings, the purpose of providing

17   a declaration like this --

18        THE COURT:  Wait a second.  You may not have

19   understood my question, because I thought I heard you say

20   there is no difference between the two.  I'm talking about

21   Mr. Kitzes' declaration in this case and the declaration that

22   he gave in the case cited by the defendants in which his

23   declaration, the court did strike his declaration.

24        MR. WOLDEN:  I'm sorry, your Honor.  I misunderstood

25   the question.

KELLY O'HALLORAN, OFFICIAL COURT REPORTER, USDC -- (916) 448-2712

 1            THE COURT:  Okay.

 2            MR. WOLDEN:  I haven't seen that declaration, but it

 3     certainly does deal with the same issues, your Honor.  And

 4     our point there is that Mr. Kitzes was obviously allowed to

 5     testify on numerous subjects.  On the question of the

 6     ultimate issue, whether or not it constitutes a banned

 7     hazardous substance under the act --

 8            THE COURT:  Right.

 9            MR. WOLDEN:  -- we offered that testimony, your Honor,

10     to assist the Court in understanding the manner in which the

11     CPSC and the CPSA interact in terms of coming to that

12     conclusion.  We do not, nor suggest, that Mr. Kitzes'

13     conclusion that this meets the definition of a misbranded

14     hazardous substance is intended to supplant the ultimate

15     trier of fact who will decide that issue.  However, as in the

16     Neether case in which Mr. Gidding was qualified as an expert,

17     this is an unusual area which involves a governmental agency,

18     both of which Mr. Kitzes and Mr. Gidding have experience.

19     And in the Neether case, Mr. Gidding was qualified to talk

20     about the inner workings of the CPSC as it did its work and

21     how it conceptualized its work.  And we believe in the same

22     regard that the Kitzes declaration explains, based upon his

23     experience at the CPSC and based upon his vast knowledge of

24     the CPSA, both as a representative of the CPSC and as a

25     licensed safety engineer, that that would assist the Court in

1    understanding the application of the framework.

2         THE COURT:  But when Kitzes makes a statement such as

3    one I read, Section 25(a) states, and he goes on, or

4    manufacturers must comply with the FHSA, and he goes on,

5    those are legal conclusions.

6         MR. WOLDEN:  They are, your Honor.

7         THE COURT:  That invades the province of the Court.

8    So those shouldn't be in this declaration, and they should be

9    stricken; correct?

10        MR. WOLDEN:  Well, I don't agree that they should be

11   stricken because they provide the foundation for his

12   observations and we believe the guidance that we're trying to

13   offer the Court in understanding how the CPSC would operate

14   in applying the CPSA to a product such as this.

15        THE COURT:  And then I get to the most troubling part.

16   And that is his conclusions in the original declaration.  In

17   paragraph 12, his conclusion that when the Cosco stroller is

18   folded and unfolded in the presence of children, it meets the

19   definition of a banned hazardous substance.  Paragraph 15,

20   the Cosco Juvenile 01834 stroller is defective and

21   unreasonably dangerous, and then the goes on.

22        He's an attorney.  How could he in any way render that

23   opinion?  I have real problems with that type of declaration

24   from someone who is a lawyer.  And I don't see in any way I

25   would allow it at a trial.  And I know this is a class

1    certification motion, but that's the argument the defendants

2    are raising.  One, it's not reliable, and two, he's not

3    qualified to do that.  And three, there's a case in which he

4    tried to do that and the district court judge struck that

5    opinion.

6         All those are working against you.

7         MR. WOLDEN:  I understand, your Honor.  I'd simply

8    point out that with respect to his opinions regarding the

9    hazard, the focus of the court's attention in terms of why it

10   was not going to allow Mr. Kitzes to testify on that was

11   because it believed that the hazard alleged in that case was

12   sufficiently obvious and common that the trier of fact did

13   not need Mr. Kitzes to assist them in that regard.  And

14   again, your Honor, we're offering this testimony at this

15   stage.  We would not offer this testimony at trial.  But

16   we're offering it at this stage, your Honor, because you are

17   assessing whether or not this case is worthy of

18   certification.

19        THE COURT:  Right.

20        MR. WOLDEN:  And we're offering it to assist your

21   Honor if he chooses to believe that that assists him in terms

22   of deciding whether the class prerequisites are met.  And so

23   offering it for that limited purpose and with that limited

24   context, what we are offering is essentially a map by which

25   someone like Mr. Kitzes, who is a former CPSC attorney and a

1    safety engineer, would evaluate that in terms of assessing

2    that compliance.  Obviously the Gidding declaration suffers

3    from the same problems.  And if there was going to be any

4    striking, it should be mutual.

5           THE COURT:  Except that Gidding doesn't attempt to

6    reach the ultimate conclusion.  For the record, the case I've

7    been referring to is Landrin vs. MGA Entertainment, Inc.

8    It's a case out of the United States District Court for the

9    Southern District of Florida.  And it's cited as 2006 WL

10   5249735, Southern District of Florida.  Again, it's a 2006

11   case.

12          Mr. Meyer, let me ask you, as I read the Landrin case,

13   however, it appears to me that it wasn't necessarily in the

14   context of a motion to certify.  Am I reading that case right

15   or was this really a motion to strike testimony at trial?

16          MR. MEYER:  To the best of my recollection, I don't

17   think that was a class certification case.

18          THE COURT:  Does that make a difference, do you think?

19          MR. MEYER:  It shouldn't make a difference here, your

20   Honor, because what is at issue here in our class

21   certification hearing is what can the plaintiffs show you;

22   how is plaintiff going to bear her burden of showing you what

23   her plan is on proving this case on a classwide basis.  And

24   for that reason, the same rules should apply as to what

25   you're considering.  In this instance, you should be applying

1    the Daubert rule.  Now, I know there -- you know, that's been

2    recognized by the Second, Third, and Fifth Circuits.  I

3    believe it's up on appeal now in the Dukes II case here in

4    the Ninth Circuit.  But even if you go to some lower

5    standard, it's still inappropriate.  Though we don't get to

6    the merits today on class certification, we do have an

7    inquiry at least into some issues of the merits because it's

8    so important to understand how is this going to be proved up

9    at trial.  And for that reason, rules like the Daubert rule,

10   or whatever rule gets applied in class certification if the

11   Ninth Circuit goes a different way, need to be applied.  And

12   Mr. Kitzes has overstepped the bounds of things that are

13   appropriately considered.

14        THE COURT:  Okay.  Let me turn to Mr. Manning's

15   declaration which is the other declaration that defendants

16   have asked me to strike.  And in reviewing both the

17   declaration, including the video, Mr. Wolden, the argument in

18   its most simplistic form is he's not really doing a

19   scientific investigation.  I mean when you watch that video

20   and I read the declaration, he or someone for him went out

21   and bought four or five other strollers, and he looks at the

22   strollers and he sticks his finger in the place where your

23   finger can get caught in each and every stroller and then

24   ultimately reaches the conclusion that you want him to reach,

25   and at least want the Court to consider, in that the stroller

 1    at issue in this case is hazardous in some way.  And I

 2    compare that to the declarations I got from the defendants in

 3    which they talk about standards and requirements and testing

 4    done on the sharpness of the edge involved with these

 5    strollers.  That to me seems the type of opinion testimony

 6    that is helpful to a jury.  I don't see, and I'll give you an

 7    opportunity to change my mind on this, but I don't see that

 8    Mr. Manning did anything that you or I couldn't have done or

 9    that eight jurors couldn't have done.

10         So where is the scientific part of this that makes it

11    so reliable that it would assist a jury or even assist a

12    court and that I should, again, allow this type of testimony?

13    Recognizing it's a motion to certify, it's not trial, but

14    it's lacking a lot when I compare it to the defense

15    declarations.

16         MR. WOLDEN:  Well, your Honor, first of all, we accept

17    that the Court may ultimately decide for purposes of trial

18    and for purposes of what the trier of fact considers that the

19    hazard and the defect alleged is sufficiently simple and

20    common and that the trier of fact itself doing what

21    Mr. Manning has done could make the determination itself.

22    And that may be the Court's determination at trial.  Again,

23    we are offering demonstrative evidence that we believe is

24    appropriate given the type of product we're dealing with

25    here.

1          Clearly as he testified in his deposition, in

2     evaluating the hazard in the manner that he did, he applied

3     what is considered to be the design hierarchy, the three-step

4     process where you evaluate the hazard, see whether there's

5     any reason for it to be there, and if it cannot be designed

6     out logically and simply, then you go to different steps

7     which would involve guarding or warning.

8          THE COURT:  It's all qualitative, though, as the

9     defendants argue.  There's nothing quantitative.  And he

10    admits that in his deposition.  And so how does that in any

11    way become, one, an expert opinion and, two, in any way

12    assist a trier of fact?

13         MR. WOLDEN:  Well, because Mr. Manning, in his 40-plus

14    years of being a design engineer, will tell you that this is

15    what they do in a case such as this.  They would look at the

16    design in issue.  And the first place they go is are there

17    other examples of the same art that I can compare this to to

18    see whether or not there's any necessity or any value or any

19    reason for this particular hazard to be there.  And that's

20    why he performs what is a quantitative analysis comparing one

21    stroller to the art that exists out there.

22         THE COURT:  Here's the problem.  And it's argued by

23    the defense.  He sticks his finger in and then says, in

24    effect, that's sharp.  But as the defendants argue, he can't

25    say how sharp the hinge is, he can't provide any standard --

1    and this concerns me -- any standard by which he evaluates

2    the stroller, as compared to the defense declarations that

3    talk a lot about standards.  And again, in your reply, you

4    attack those declarations.  But there's no discussion about

5    standards in Mr. Manning's declaration.  And shouldn't that

6    concern me?

7            MR. WOLDEN:  Well, the reason -- let me respond in

8    this way.  The science that the defendants rely upon is

9    science that is irrelevant to this hazard, because the ASTM

10   standard which they say this stroller complies with tests the

11   stroller in its fully locked position with the locking

12   mechanism, the hazard disarmed.  As Brickman himself, the

13   defense expert who did the sharpness testing, admits that

14   sharpness is not the issue in this hazard.  It's two edges

15   converging.  So I don't take Manning's observations over

16   their irrelevant science in terms of what is most reliable

17   and what is most helpful.  That's point number one.  But the

18   fact of the matter is that as Kumho recognizes, that what

19   constitutes science is in some sense dependent upon what the

20   expert is doing and what he is looking at and that where

21   testing, some sort of laboratory work might be appropriate in

22   some cases, it would not be appropriate in others.

23          And here, your Honor, we're frankly not aware of any

24   standards absent the testing of, you know, I suppose we could

25   use cadavers and hands and test the forces.  We did not

1    believe that to be sufficient, that to be necessary for

2    purposes of a motion such as this.

3         THE COURT:  You're saying Manning doesn't believe that

4    there's any standards that would apply to this stroller?

5         MR. WOLDEN:  We identified none that would apply

6    specifically to this stroller in the manner in which it

7    closes and to this particular pinch point.  We discovered

8    none.  We know that the ones that the defense relies upon are

9    irrelevant to the hazard alleged.

10        So I suppose that for purposes of trial, Mr. Manning

11   could conduct some type of cadaver study, some type of

12   studies that might quantify the forces applied.  We did not

13   believe that to be necessary for purposes of a motion, that

14   is, of a declaration that is essentially designed to provide

15   demonstrative evidence helpful to the Court.

16        THE COURT:  Mr. Meyer, let me ask you.  Doesn't your

17   objection really go towards, and the request to strike, go

18   towards weight, that I should give this not admissibility?

19        MR. MEYER:  Well, your Honor, we disagree with that

20   point, because we do have to meet with our experts in court

21   some standard of science.

22        THE COURT:  They say there's no standards that apply.

23        MR. MEYER:  Well, there are standards that apply.  We

24   have demonstrated that, including also a standard that hasn't

25   been mentioned, which is this sharp edge test that

1    Mr. Brickman undertook and Mr. Brown, our other expert.  He

2    sectioned, he applied science, he sectioned the cross-section

3    of this part of this hinge and compared it microscopically to

4    the section of the hinge that the plaintiffs' expert says is

5    okay.

6            There was another product that Mr. Manning touted as,

7    well, this is another one that's got a hinge, and this one's

8    not as sharp, based on his subjective look at it.  And we

9    cross-sectioned it.  It's not as sharp.  Our product is not

10   as sharp.  We looked at it under the microscope.  That's the

11   kind of science you have to have to get past the hurdle to

12   stand here in court and to be able to give opinions.  And

13   that's what we're -- you know, that's what we're pointing

14   out, that you have to come up to some level of scientific

15   inquiry, of scientific method, and that Mr. Manning just

16   doesn't get to that point given that he's not applying a

17   scientific method.  He's just applying the same thing that

18   the jury could by taking a look at the hinge themselves.  And

19   that's not helpful.  Whereas, our fellow's opinion is

20   helpful, because you go down and you try to understand, well,

21   what's some of the similar science that's behind this hinge?

22           THE COURT:  Mr. Wolden, again, I'm not going to get

23   deeply into the merits of this case, but after reading the

24   two declarations -- and again, I understand that they're

25   submitted, in part, to provide the Court with some foundation

1    and background.  I'm sitting here left thinking I know how

2    the defense is going to try to defend against the claim, but

3    I'm sitting here thinking how are you going to prove the

4    claim?

5                MR. WOLDEN:  What we would propose to do is to allow

6    the trier of fact to do exactly what Mr. Manning did, and we

7    would also potentially do additional studies regarding not

8    the sharpness of an edge but the convergence of these two

9    edges, because it's the convergence of these two edges and

10   the crushing of those two edges together which creates the

11   hazard.

12               Now, Manning correctly pointed out I think that the

13   sharper the edge, the more severe the hazard.  But the

14   question is the convergence of two edges, not the sharpness

15   of a single edge in terms of the creation of this hazard.

16   But we're going to ask the trier of fact to examine the same

17   strollers that Mr. Manning demonstrates in his video, and we

18   are going to submit testimony from Mr. Manning regarding his

19   examination and any testing that he might perform between now

20   and the point of trial.

21               THE COURT:  Okay.  All right.  Moving to the motion

22   itself, let me begin, Mr. Wolden, with a point raised towards

23   the end of the opposition brief.  And that is the argument

24   that your motion fails to address in any way the Federal

25   Rules of Civil Procedure 23(b)(2) issue.  It's a 23(b)(3)

 1   motion in every respect and in all your arguments.  But do

 2   you agree with that defense point that this isn't a 23(b)(2)

 3   case?  And Mr. Ram, you're walking forward, so I assume

 4   you're going to address that.

 5        MR. RAM:  Thank you, your Honor.  In our papers, we

 6   ask the Court to certify the injunction claims only under

 7   23(b)(2) and to certify the damages and restitution claims

 8   under 23(b)(3).  And that's fairly common.  That with respect

 9   to our request for an injunction, you would not want people

10   to opt out of the class.  There's going to be one injunction,

11   and everyone will be bound by it.  With respect to damages

12   and restitution, you would allow people to opt out.  And so

13   that's where the 23(b)(3) comes in.  And that is in our

14   papers, perhaps not as well developed as it might have been,

15   but it is in our papers, your Honor, and that is what we

16   would propose to the Court.

17        THE COURT:  Mr. Meyer, do you want to respond to that?

18        MR. MEYER:  Yes, your Honor.  Would you like me to

19   step up to the podium?

20        THE COURT:  Sure.

21        MR. MEYER:  Judge, a couple points.  And I think an

22   important first point is the point of waiver.  This was not

23   developed in the briefing by the plaintiff.  They originally

24   now really put this forward in the briefs as a (b)(3) class.

25   So I think one initial point is that it may be appropriate to

1    have proper full briefing on it.  I don't think that's

2    occurred.  But, you know, we can make -- of course you've

3    made the point that we've killed enough trees here as well,

4    your Honor.  But I do need to make the waiver point to

5    obviously protect my record as well.  But getting to the

6    substance here --

7            THE COURT:  There's only one sentence at the end.  And

8    it talks about if, in fact, defendants are still selling this

9    stroller, then plaintiffs reserve the right to seek

10   injunctive relief.  That's the only real discussion I saw.

11           Am I correct on that, Mr. Ram?

12           MR. RAM:  I believe so, your Honor.  I can look and

13   see whether there's anything more than that if the Court

14   please.

15           THE COURT:  Are these strollers still being sold?

16           MR. MEYER:  Yes, sir, they are.

17           THE COURT:  Okay.

18           MR. MEYER:  So my first point is really one of waiver.

19   They didn't raise it.  We didn't fully brief it.  And that

20   places the defense at a disadvantage in terms of these new

21   points really being raised for the first time in the paper

22   that was filed on Friday, the statement about today's oral

23   argument.  So we didn't expect this.  It's waived.  And if

24   it's not deemed waived, we should have an opportunity to

25   fully brief it.  If your Honor is inclined to decide today,

1    though, I would point you to the precedent in the Ninth

2    Circuit and in various California courts that makes a strong

3    point about the rule.  The rule is that if the case is one

4    that is predominantly one that is for damages, it should be

5    under the standard of 23(b)(3).  There's a couple of cases to

6    take a look at.  If the monetary relief clearly predominates,

7    the injunctive relief becomes incidental, a (b)(2) class is

8    appropriate.  There's the Gonzalez case that's in the

9    Southern District of California talking about how the claim

10   for monetary damages must be secondary to injunctive relief

11   if you're going the (b)(2) route.  That's not this case.

12   That's not our case.  Some of the other cases that you see,

13   cases like Zinser, that's a Ninth Circuit case.  That's a

14   pacemaker implantee.  They're looking for a 23(b)(2)

15   subclass.  The court held that it couldn't be certified.  It

16   said that this injunctive relief is merely incidental to the

17   primary claim for money damages.  There's also another Ninth

18   Circuit case called Kanter.  It goes to the very same point.

19   It involves a lice remedy.  And there was damages sought as

20   well as enjoining the selling and advertising of it.  In

21   addressing whether to remand the case, the court stated that

22   23(b)(2) could not provide any jurisdiction.  Injunctive

23   relief was not the primary object of the litigation because

24   the litigation was really looking for damages, and damages

25   awards would accomplish what we believe -- this is quoting

 1  the court -- would be the plaintiffs' essential goal in this

 2  litigation.

 3          THE COURT:  Okay.

 4          MR. MEYER:  It's a 23(b)(3) --

 5          THE COURT:  I'm going to cut you off.  I got the

 6  point.

 7          MR. MEYER:  Yes, sir.

 8          THE COURT:  It just was a specific question I wanted

 9  answered.  The second question for you, Mr. Ram, there's a

10  point raised by the defense, again towards the end of the

11  opposition, that in no way does the motion address, other

12  than in a footnote or as an aside, Wal-Mart and the Wal-Mart

13  subclass issue.  And the defendants make a valid point that

14  your plaintiff at this point has no proof other than her

15  statement that she actually bought the stroller at Wal-Mart.

16  She doesn't have a receipt.  She doesn't have anybody with

17  her.  No one can verify her testimony that she went to

18  Wal-Mart to buy this.  But I'm concerned that that issue

19  wasn't in any way briefed by you.  And I'm not sure what

20  you're asking for in terms of Wal-Mart.  This stroller's sold

21  by a lot of different retailers.  Wal-Mart sold, at least you

22  believe, I think 125,000 is the number you used.  But the

23  defendants raised a valid point that that wasn't really

24  addressed in your papers.

25          MR. RAM:  If I could respond to that.

1          THE COURT:  Go ahead, Mr. Ram.

2          MR. RAM:  It was addressed in the opposition to the

3    motion for summary judgment because this issue was raised

4    there.  And what we demonstrated was that in addition to her

5    own testimony, there were certainly others who knew both

6    Mr. San -- who could identify the stroller that she had

7    purchased from visual examination.  That can be offered.  And

8    so there certainly is some additional support for the

9    reliability of her testimony that she did, in fact, purchase

10   one of these strollers.  Most importantly, Mr. Sanchez, who

11   saw her with the stroller, her with the same stroller, and

12   told her about his experience with that stroller.

13         THE COURT:  That's not the question I'm asking.

14   There's no proof that she bought it at Wal-Mart.

15         MR. RAM:  Just her own statement, your Honor.

16         THE COURT:  Right.

17         MR. RAM:  Absolutely.

18         THE COURT:  So what are you asking me to do with

19   respect to Wal-Mart?

20         MR. RAM:  Well, your Honor, I would respectfully

21   submit that may make her typical of the class.  I don't think

22   I've got the receipts of everything that I've bought at

23   Wal-Mart.  And she is prepared to come in, as she said in

24   deposition, and take the witness stand and submit to

25   cross-examination, and then the trier of fact can decide

1    whether for some reason she's lying about having purchased

2    this stroller from the store, which apparently sold most of

3    them.

4          And again, I would agree with the Court that our

5    analysis of the implied warranty and merchantability claim

6    was not as many pages as it might have been, but it was in

7    the papers, and we are asking the Court to certify the

8    Wal-Mart subclass on the implied warranty of merchantability

9    claim which we point out in the papers is really just a

10   function of whether that product lives up to the reasonable

11   consumer expectation.

12         THE COURT:  The argument's found on page 44 and 45 of

13   the defense opposition.  And the argument is that I should

14   not entertain certification of a class against Wal-Mart.  And

15   the argument is that you bury in a footnote the statement

16   that "the probable need for a Wal-Mart subclass given

17   approximately 135,000 strollers were retailed by Wal-Mart."

18   It's in your opening brief, page 2, note 2.

19         Defendants argue the subclass question is no

20   technicality.  Just as plaintiff bears the burden of proving

21   the applicability of each of the Rule 23 elements to a

22   proposed class, she also has a burden of proving each of

23   those elements with respect to any subclass.  Citing Zinser

24   vs. Accufix Res. Institution, Inc., a Ninth Circuit case, 253

25   F.3d 1180.

1          Defendants go on to argue:  But far from providing a

2     rigorous analysis of these issues as they apply to this

3     purported subclass, plaintiff engages in no analysis at all.

4     Plaintiff nowhere analyzes the propriety of such a subclass

5     and, apart from that footnote, does not even mention the

6     issue anywhere in the rest of her brief.  This failure is

7     alone sufficient to deny certification as to Wal-Mart.  And

8     then the argument goes on.  I didn't see a response to that,

9     and I'm still searching for a response to that.

10          MR. RAM:  Yes, sir.  I'm looking at page 15 of our

11     opening brief.

12          THE COURT:  Well, I'm looking for something in your

13     reply brief.

14          MR. RAM:  I'm sorry, your Honor.  May I say where we

15     address this in the opening brief?

16          THE COURT:  Go ahead.

17          MR. RAM:  Page 15, line 4.  Subheading 6, whether

18     defendant Wal-Mart breached the implied warranty of

19     merchantability.  And we go on to discuss how the law inserts

20     the implied warranty of merchantability into consumer

21     contracts such as this.  We talk about what the elements are,

22     and we discuss how we can prove them.

23          From our standpoint, your Honor, the case is not as

24     complicated as defendants would have it.  From our

25     standpoint, we've got exactly what the California Legislature

1    had in mind when it created the consumer protection statutes

2    we're here under.  They are selling what we allege is a

3    dangerous stroller.  In the record, we have evidence that it

4    violated their own safety standards and that they sold it

5    anyway.  In the record, we have evidence of at least 17

6    people who were seriously injured.  And these are just the

7    ones who have come to light.  Obviously for every one of

8    those 17 people who finds their way all the way to Dorel,

9    there are a lot of people out there who called, and we don't

10   have the records yet.  They just dumped 13,000 pages of

11   emails on us yesterday, your Honor, customer service emails.

12   And so from our standpoint, we've got a dangerous product

13   intended for babies and parents that violates the implied

14   warranty of merchantability and violates the Consumer Legal

15   Remedies Act.  And to some extent, that perhaps was so

16   apparent to us that we didn't spell it out in the detail that

17   now I see we should have.

18        THE COURT:  Remind me where in your papers you

19   submitted evidence that you believe Dorel violated their own

20   safety standards.

21        MR. RAM:  This is in the declaration of Kirk Wolden in

22   opposition to defendants' motion for summary judgment.  It

23   was executed on June 19, 2008.  And it's Exhibit 9 to that

24   declaration, your Honor.  This is a Dorel Juvenile Group new

25   stroller evaluation.  In the middle of the page, it says the

1    stroller, and then in all caps and bold, does not meet Dorel

2    Juvenile Group design requirements for carriages and

3    strollers.  The following issues were found.  There are four

4    numbered points, at least on this page, which is Bates number

5    Sanchez 0000134.  Point 4, Dorel Juvenile Group says there is

6    a pinch point between the upper and lower part of the locking

7    mechanism.  That's why the stroller does not meet their

8    internal standards.  And then the following page, photo 5,

9    you can see that's the pinch point that we're here about.

10   It's the pinch point that has injured at least 17 people who

11   we so far know about.

12        THE COURT:  Hang on.  Please don't put equipment on

13   our equipment.

14        MR. MEYER:  I apologize, your Honor.

15        THE COURT:  Second, I know what the stroller looks

16   like.

17        MR. MEYER:  I was getting ready to make a responsive

18   point.

19        THE COURT:  Go ahead.  Okay.  So it's in that exhibit.

20        MR. RAM:  Yes, your Honor.

21        THE COURT:  All right.  On that point only, and I'll

22   come back to plaintiffs, Mr. Meyer, you may respond.

23        MR. MEYER:  Yes, sir.  On that point only, your Honor,

24   if I -- I'll hold it.  Is it okay to put it up here on the

25   podium?

1            THE COURT:  That's fine.

2            MR. MEYER:  Responding to that point.  And again,

3    we're not here to argue the merits.  What Mr. Ram and

4    Mr. Wolden are pointing to is an evaluation of the stroller

5    that was made during its development.  And it's referring not

6    to the hinge that they're litigating here, your Honor, but

7    it's referring to, and this comes out in the deposition of

8    Mr. Hume, it refers to the issue that when the stroller

9    flexes during use, this little gap here may open up.  That's

10   the concern that's made in evaluating the stroller.  And when

11   you've got an occupant in here, there are standards that you

12   want to make sure are met so that you don't see this little

13   gap opening up such that a child could get the child's finger

14   caught in there and pinched.  And what they were addressing

15   is the issue of how much that gap would open.  It has nothing

16   to do with this pinch point hazard that they're alleging

17   which, your Honor, is really nothing other than an ordinary

18   hinge that you encounter in any product that folds.

19           THE COURT:  Okay.

20           MR. MEYER:  Just to make that clarification, your

21   Honor.

22           MR. RAM:  Can I briefly respond to that one, your

23   Honor?

24           THE COURT:  You may.

25           MR. RAM:  This is essentially what I do, is these

1   product class actions, your Honor.  And it's always curious

2   to me to see the contemporaneous documents generated by the

3   defendant and then to see the afterward generated

4   explanation.  But just looking here at the contemporaneous

5   document from the defendant, the point I read -- and I won't

6   belabor the page again.

7        THE COURT:  Tell me the date of that document.

8        MR. RAM:  July 26, 2002, your Honor.  That's at the

9   top of the page under date of manufacture.

10       THE COURT:  When did these strollers hit the market?

11       MR. WOLDEN:  I believe in late 2002, your Honor.

12       THE COURT:  This is again before the stroller came

13   out?

14       MR. WOLDEN:  Yeah.  According to the document, it was

15   a design evaluation that preceded Dorel's distribution of the

16   stroller.

17       THE COURT:  Okay.

18       MR. RAM:  And then, your Honor, on the very next page,

19   which has the Bates number 135, it's page 2 of 2, there is an

20   August 1, 2002, date.  So that may well be the date of the

21   document.  But it's in that late July, early August time

22   period.  And on the first page, the point 4 says there is a

23   pinch point between the upper and lower part of the locking

24   mechanism, photo 5.  And you look on the next page, photo 5

25   is the pinch point that we're here about.  We're not here

1    today to try the case.

2            THE COURT:  Right.

3            MR. RAM:  But we think we've certainly got enough in a

4    case involving danger to children in a consumer product that

5    we ought to be allowed to let the trier of fact decide and

6    not have a battle of the experts decide it at the class

7    certification stage, your Honor.

8            THE COURT:  Okay.  I want to get to what I see as the

9    guts of this motion.  And both sides obviously lay out the

10   requirements of Federal Rule of Civil Procedure 23.  And

11   there's much discussion in both briefs about numerosity,

12   typicality, commonality, adequacy of representation, and that

13   questions of law or fact common to the members of the class

14   predominate over any questions affecting only individual

15   members, and that a class action is superior to other

16   available methods for the fair and efficient adjudication of

17   the controversy.

18           And as you said, Mr. Ram, I know you view this case

19   much differently than the defense does.  And that is clear

20   from the briefs that you don't view this as being as complex

21   as the defendants are making it.  As I understand your

22   motion, the class would be purchasers of the stroller only

23   who reside in California.

24           MR. RAM:  Yes, your Honor.

25           THE COURT:  Okay.  So you limited it geographically.

```
1              MR. RAM:  Yes, your Honor.

2              THE COURT:  Are you trying to define a class by way of

3     time periods?  In other words, is it any and all purchasers

4     since the stroller hit the market or is it limited to any

5     time period?  I just needed clarification.

6              MR. RAM:  We've not limited it by time period, your

7     Honor.

8              THE COURT:  Okay.  You make a statement that Dorel has

9     sold more than 250,000 strollers.  By that you meant only in

10    California; correct?

11             MR. RAM:  Yes, your Honor.

12             THE COURT:  Okay.  The defense makes a point that even

13    if you take that number, there's only been two claims in the

14    state of California.  You at least present evidence of at

15    least 17 claims of people being injured.  But out of those

16    17 -- and the number the defense uses is actually 15.  But

17    taking your number, 17, do you agree that there's only been

18    two people who have complained of injury, one being

19    Ms. Sanchez's uncle and the other someone else, that those

20    are the only two at least that you've discovered so far?

21             MR. RAM:  You mean who filed a lawsuit, your Honor?

22             THE COURT:  Filed a lawsuit suit or notified Dorel

23    that they've suffered an injury.

24             MR. WOLDEN:  Of the 17, we do not disagree with

25    defense counsel that two of those were from California.
```

1    However, we believe that the experience nationally should

2    dictate their conduct here in California in terms of

3    protecting consumers.

4        THE COURT:  Well, their response to that is if you

5    look at it nationally -- remind me of the number.  Here it

6    is.  1.75 models sold nationwide.  And out of that, only

7    17 -- well, 15 if I use defense number, 17 if I use

8    plaintiffs' number -- 17 out of 1.75 models.  Tell me why

9    that isn't significant in terms of the merits or lack thereof

10    of this case.

11        MR. WOLDEN:  What we believe is more significant, your

12    Honor, is the severity of injuries that are being inflicted

13    in terms of consumer protection and the protection of

14    children and the purchasers of these strollers.  We've got

15    very serious injuries.  We're talking about nerve damage.

16    We're talking about bone crushing.  We're talking about 20

17    stitches in an infant.  We're talking about chunks of flesh

18    being removed from infants.  And we're comparing that, your

19    Honor, to another recall that occurred --

20        THE COURT:  Where there were nine.

21        MR. WOLDEN:  -- where there were nine.  And nine

22    described as lacerations with no indication of their

23    severity, which resulted because that manufacturer, we know

24    now, voluntarily reported these incidents to the CPSC and

25    cooperated with the CPSC and rectified this problem.

1          THE COURT:  Stop there, because I want Mr. Meyer to

2     respond to just that, their argument that it's really not the

3     number, it's the type of injuries, and in that one instance

4     there were only nine complaints and the manufacturer engaged

5     in a recall.  What's the distinction?

6          MR. MEYER:  Absolutely, your Honor.  The distinction

7     is that this product is not defective.  Now, we're not here

8     to try the merits today.  We're here about class

9     certification.  But these are important points to discuss

10    nevertheless.  This is an open and obvious hinge.  This hinge

11    is right in front.  When you use this stroller and you follow

12    the instructions, and indeed when you follow common sense,

13    you grab it by the handles to deploy it because that hinge

14    closes.  Your fingers are nowhere near that hinge.  It's not

15    defective.  What happened in the case of Mr. Salvador Sanchez

16    --

17         THE COURT:  I want to focus on the other manufacturer.

18         MR. MEYER:  Sure.

19         THE COURT:  Because they're using that other

20    manufacturer where there were only nine complaints received

21    as the responsible manufacturer.  And that's the argument.

22    They were responsible.  Dorel wasn't.  And so I'm trying to

23    find out from you what you think the distinction is between

24    that stroller and your stroller.  I know one thing you say is

25    your stroller isn't defective.  But it's really focusing on

1    the actions of the company.

2           MR. MEYER:  Well, your Honor, I do not know the merits

3    of that other situation.

4           THE COURT:  Okay.

5           MR. MEYER:  I don't know the motivations of that other

6    manufacturer.  I don't know what pressures, what situation.

7    I haven't analyzed the sharpness of the edge supposedly in

8    the hinge from the other manufacturer.  I don't know anything

9    about the facts of that other stroller.  What I do know is

10   about the facts of our own stroller and that it's not

11   dangerous.  That's really the best response.  We have not

12   reported to the CPSC because we do not believe -- and we will

13   stand up and defend this product if need be -- we do not

14   believe it's defective, and it is not defective when you

15   consider all the facts, and many of them highly

16   individualized, your Honor, going of course to the class

17   certification issue.

18          THE COURT:  All right.

19          MR. WOLDEN:  Well, briefly, your Honor, if I might

20   make one point.

21          THE COURT:  You don't need to.  I want to get to how I

22   view this and give the plaintiffs a chance to respond.

23          The defense raised a point that you hadn't submitted a

24   proposed trial plan.  You responded by submitting a proposed

25   trial plan.  And I'll give Mr. Meyer an opportunity to

1    respond to that.  But in looking at the plan, again, I know

2    you view this as a case that there really are some issues

3    that are common to anyone, and that is, and again your view

4    concerning is it dangerous, is it a dangerous product.  As

5    you set forth in your work plan and as you argue in your

6    briefs, there really are certain issues that are common to

7    everyone.  And focusing on the stroller itself, is the best

8    way to put it, if you focus on the stroller itself, your

9    argument is it's better done by way of a class action because

10   there were so many purchasers of this stroller, and there's

11   really this issue of is it defective, is it dangerous, should

12   it have been labeled.  And there is something to your

13   argument that the way the defense responds to that is they

14   really focus more on the merits of the case, not on the issue

15   of commonality.

16        Even if I give that to you, here is where I'm having a

17   problem with the motion.  Take that just for purposes of

18   argument as a given, that I think that maybe that is more

19   appropriate by way of a class action.  Then you get to the

20   point that you make and the issue raised of so they didn't

21   label it, and did those omissions in some way violate the

22   law.  But there's this issue of were the omissions material

23   under the reasonable consumer standard?  And that sets off

24   bells and whistles in my mind as a matter of law.  And it's a

25   point raised by the defense, that how are you going to

 1      determine that if they don't get an opportunity to depose

 2      every single plaintiff?  Because whether it's material to one

 3      person or not material to another person requires an

 4      individual determination.  That's a big problem I have.  And

 5      I want you to address that, because I think I counted in the

 6      opposition at one point, and I'll direct you to this point,

 7      but they listed I think at least ten different issues within

 8      that big issue that require individual determination.  And if

 9      their due process rights, as they argue at the end, and

10      fairness is to be given to both sides in this case, that type

11      of inquiry would be required.  And that cuts against granting

12      the motion to certify this as a class.  So I'll give you a

13      chance to address that, but that is sort of big stumbling

14      block number one for me.

15          Go ahead.

16          MR. RAM:  This is well-established in California law.

17      California state cases, California district court cases, and

18      recently in the Ninth Circuit, the Williams vs. Gerber case.

19      It's the reasonable objective standard.  The question under

20      the California Consumer Legal Remedies Act and under the

21      unfair competition law is is it material to the reasonable

22      objective consumer and the trier of fact?  If it's a question

23      tried to the court, your Honor, if it's a question tried to

24      the jury, the jury, determines whether it is material to the

25      reasonable objective consumer.

1          Now, are some consumers more cautious than the

2     reasonable objective consumer?  Sure.  Are some more risky?

3     Sure.  That doesn't matter.  What matters is the Legislature

4     and the Ninth Circuit and California state courts have all

5     said it's a reasonable objective standard.  Was it material

6     to that reasonable objective consumer?

7          THE COURT:  But how do you prove that?  That's the

8     question that keeps coming up.  Your argument jumps from it's

9     defective to, judge, you can absolutely presume that it was

10    material.  And I sit there reading the briefs and thinking

11    how are you going to get to that?  How are you going to prove

12    even that presumption?  How is that better done in a class

13    action as opposed to individual actions?  And, finally, how

14    are the defendants going to be able to defend against that in

15    a class-action-type situation?

16         MR. RAM:  I understand, your Honor.  And that's

17    exactly what we were confronting in the Chamberlan vs. Ford

18    case.

19         THE COURT:  You rely on that heavily.

20         MR. RAM:  Your Honor, that case settled one court day

21    before trial.  So we pre-tried that entire case.  We were

22    ready to go.  And so we struggled with all those issues.  And

23    I could submit proposed voir dire and I could submit jury

24    questions if the Court wishes at some point.  But I rely on

25    it because that broke the ground.  We're not making it up

1          here.  And we had various ways that we were going to do it

2          there.  You have the class representative testify.  You can

3          have an expert about this sort of product testify.  You can

4          have a marketing expert testify.  You can do a random sample

5          if you wish.  There are all kinds of ways that we can prove

6          it and that the defendants can prove it.  And we understand

7          we've got the burden of proof.  But here today, of course,

8          and you're probably getting tired of hearing me say this at

9          this point, we're not trying the case.  We're just showing

10         you that as in the Chamberlan case, we are prepared to try

11         the case, and we'll do what it takes to convince the Court

12         that we're doing it in a reasonable, reliable way for the

13         trier of fact.

14              THE COURT:  All right.  Let me stop there.  Mr. Meyer,

15         I want you to respond to that and tell me why Chamberlan vs.

16         Ford doesn't control on that issue.

17              MR. MEYER:  Yes, of course, your Honor.  A number of

18         things.  First, an important distinction between our case and

19         the Chamberlan case is that the Chamberlan case involved

20         these intakes inside of an engine and was what you can call a

21         hidden alleged defect.  Our case is a case that is about a

22         hinge that is front and center.  It's out in the open.

23         There's no way any reasonable person using this stroller can

24         possibly miss it.  And that's a critical, critical

25         distinction.  And, indeed, if look at each one of their

1    cases, Chamberlan, there's another one called Mazza, Central

2    District of California, another one called Parkinson, and

3    Hewlett-Packard, various California cases, state and federal.

4    All of them involved hidden defects.  And that is a

5    significant distinction.

6         Going further, though, your Honor, another important

7    point to respond to Mr. Ram is that when we're here on class

8    certification, it is really time to put up or to hang it up,

9    frankly.  They need to come forward with this trial plan that

10   shows how they can accomplish things at trial.  If they're

11   looking for this inference of reliance and materiality, well,

12   they need a record that's going to permit it.  The

13   Massachusetts Mutual Life Insurance case, 97 Cal.App.4th

14   1282, 1294 to 95, says that you've got to have the record to

15   support it.  And there isn't a record here to support it.

16        They brought forward these two experts that we've

17   talked about at length, but none of them address this

18   critical aspect of the case.  Where is the expert?  Where is

19   the plan?  Where is the evidence that talks about how this

20   stroller with this hinge that's front and center open and

21   obvious would have presented this, you know, this hidden

22   problem that has to be warned against, warned against with

23   respect to this particular hinge?  You know, where is the

24   proof?  Where do you show that had this product had these

25   explicit instructions or this explicit warning about this

1    particular thing that people wouldn't have bought it?  You

2    know, where is that testimony?  Where is that evidence?  We

3    don't have it.  Rather, what is present in this record is the

4    Chris Wood testimony that talks about how people respond to

5    warnings, that talks at length, you know, that's in the

6    record about how warnings function and how there isn't any

7    commonality across the class.  There isn't going to be the

8    predominance on, you know, on this issue.

9          So that's really the point.  I mean it's time at this

10   class certification hearing to put it up and to show, and

11   that's what they haven't done.

12         THE COURT:  Quick response.

13         MR. WOLDEN:  The legal standard is a common standard,

14   your Honor.  It's the objective reasonable person.  And as

15   Colgan and other cases have set forth, that there's no

16   specific manner in which we are required to meet that.  It

17   can be proven anecdotally.  It can be proven survey-wise.  It

18   can be proven scientifically.  But the point is that the

19   standard that you will apply, either you or the jury will

20   apply, is an objective standard that applies commonly to all.

21         THE COURT:  Okay.  I want to give my court reporter a

22   break.  We'll come back in ten minutes.

23         I have a lot more questions.

24         (Recess taken.)

25         THE COURT:  All right.  Let's go back on the record.

1          I want to focus on arguments raised by the defense

2     that this isn't suitable for a class action because this is a

3     case that requires individualized proof of injury and that

4     individual issues permeate every aspect of the claims in this

5     lawsuit.  And it goes in part to -- this is what I was

6     looking for, and I want plaintiffs to respond to this.  But

7     it's an argument, again towards the end of the defense brief,

8     about constitutional rights and due process.  And there are

9     at least nine issues raised by the defense that they believe

10    require individualized proof or really deal with issues that

11    should be resolved on an individual basis rather than on the

12    basis of a class.

13         The defendants argue that in this case, the

14    Constitution requires that defendants be afforded the

15    opportunity to explore and introduce evidence in one trial

16    with respect to each class member's claim, including:  One,

17    whether and where the class member actually purchased the

18    stroller; two, the type of alleged representations or

19    warnings the class member heard or read; three, the knowledge

20    the class member already possessed about the supposed hazard

21    presented by the hinge; four, the factors relevant or not

22    relevant to that class member's decision to purchase the

23    stroller; five, whether the proposed warning would have

24    materially affected the class member's purchase decision;

25    six, the price the class member paid for the stroller; seven,

 1    the class member's use of and experience with that stroller;

 2    eight, whether the class member replaced the stroller; and,

 3    nine, the supposed true value of that stroller, among many

 4    other factors.

 5            So how are the defendants going to be able to defend

 6    and raise those issues if I certify this class?

 7            MR. RAM:  Well, again, your Honor, this gets back to

 8    the idea that the California courts and the Ninth Circuit

 9    have said it's the reasonable consumer standard.  So if we

10    can convince the jury and/or the Court that there was an

11    omission that was material to the reasonable consumer, then

12    we get to the next step, well, if Dorel and Wal-Mart had

13    disclosed what we say they should have -- and we don't agree

14    that it's a, quote, obvious defect.  While you can see the

15    pinch point, the problem, which is the fingers getting caught

16    and compressed and sliced are late, and that's in our papers.

17    If you had disclosed that, if you told a reasonable consumer

18    there is a good chance that somebody in your family, maybe

19    you, maybe one of your kids is going to get hurt, what would

20    that reasonable consumer then have paid for the stroller?

21    And the idea that there's only 17 of these people out there

22    is a fantasy, as your Honor using common sense could easily

23    see.

24            THE COURT:  Why is that?  I don't follow that

25    argument.

1            MR. RAM:  All right.  Well, and again, I'm drawing on

2    experience I've done in other cases, including, for example,

3    Regal Lager, the people that actually went and recalled their

4    stroller.  I had a case against them, and we showed up for

5    the first CMC, and they tell us we're the only ones in the

6    world.  And we take some discovery, and we keep finding out.

7    And by the end, there's a whole lot more people.  And then I

8    put on an expert, Richard Oliver, in the Masonite trial, who

9    is an expert on consumer satisfaction, who says for everybody

10   who makes it all the way up to the manufacturer's records,

11   there has got to be 20 or 25 people out there who are hurt by

12   this product and who haven't made it up to the manufacturer's

13   records, because you've got people -- and these aren't people

14   buying the $500 Aprica strollers, or whatever they're called.

15   These are working poor people buying a 20, $25 stroller.  And

16   so if their finger gets hurt, how many of them are actually

17   going to make a complaint to their store?  And how many of

18   them are going to somehow make that complaint in writing?

19   And then in how many of those cases is it going to get from

20   the store in writing to Dorel?

21            THE COURT:  But here's the problem.  I understand you

22   keep arguing it's the reasonable consumer.  And I guess I'm

23   fixated on the word reasonable.

24            MR. RAM:  Right.

25            THE COURT:  The defense is it's only unreasonable

1    people that get hurt.  It's not a defective stroller.  So you

2    have to be doing something that is unreasonable or not safe

3    to be hurt by this stroller.  In other words, it's impossible

4    to be hurt by this stroller if you do what you're supposed to

5    do.  So the reasonable consumer wouldn't get hurt.  The

6    reasonable person, and, in fact, even Ms. Sanchez's uncle who

7    got hurt admits he was holding the baby in one hand and

8    trying to fold up the stroller in the other when he got hurt.

9    That's not the way you're supposed to fold and unfold this

10   stroller.  And you want the Court and the jury to jump to the

11   conclusion he got hurt because it's defective, you know,

12   there's a material defect.  And the response to that is it's

13   not.  One, the statistics prove differently.  Out of the

14   1.75 million nationwide, right now we have 17.  You want me

15   to believe there's more?  Say there's a hundred.

16          And second, my bigger concern is there may be

17   something that each of those people did that the defense

18   would be entitled to explore.  And how are they going to do

19   that if I certify this class and suddenly the case is 145,000

20   people?  They can't take 145,000 depositions.  And their

21   argument, in a nutshell, is you're trying to take an

22   individual claim and make it a class action because obviously

23   it's much, much stronger as a class action, and it's

24   incredibly weak as an individual claim.  That's their

25   argument.  And I need you to respond to that.

44

1          MR. RAM:  Yes, your Honor.

2          THE COURT:  Because honestly, I tend to view the case

3     this way.

4          MR. RAM:  One thing they can do is they can

5     investigate each of the cases where a person was injured.

6     And that's what we did in this Regal Lager case that I'm

7     describing.  And that was another baby product.

8          THE COURT:  Well, we know they investigated the two

9     that occurred in California because both those cases have

10    settled.

11         MR. RAM:  We've got 17 so far.

12         THE COURT:  Your class is only the people in

13    California.

14         MR. RAM:  Right.

15         THE COURT:  So the only two people that we know about

16    in California that have been injured they did investigate and

17    they resolved those claims.

18         MR. RAM:  I understand, your Honor.  But the idea that

19    there's something different about people in other states in

20    terms of whether it's reasonably foreseeable for, say, a

21    young mother, single mother with three kids to be grabbing

22    one kid, another kid's holding onto her, and she's trying to

23    get the stroller together.  That is absolutely reasonably

24    foreseeable, your Honor.  And that's why in their internal

25    standards, they say this violates our internal standards.

1       That's absolutely foreseeable.

2              But if they want, they can put on whatever evidence

3       they want at the trial and say, yeah, person number 16, they

4       weren't reasonable, and person number 17, they weren't

5       reasonable.  But that's for trial, your Honor.  That's where

6       the trier of fact decides whether it's reasonable or not

7       based on a full record, which we don't have here, based on

8       full discovery, which we don't have here.

9              They yesterday gave us 13,000 pages of customer

10      satisfaction emails that we haven't even had a chance to look

11      at.  But that's the sort of thing, your Honor, I propose that

12      ought to happen on a full record.  But where they bought it,

13      that's got nothing to do with the case.  That's, you know,

14      what color was the Pinto.  There are all types of things that

15      people --

16             THE COURT:  But you want Wal-Mart in this lawsuit, and

17      you've named Wal-Mart.  But if they bought it at Costco, why

18      would Wal-Mart be responsible?

19             MR. RAM:  Oh, I agree with you.  I was focusing on

20      Dorel.  Where they bought it certainly matters as to

21      Wal-Mart.  And they've given us the statistics as to how many

22      of these were sold to Wal-Mart.  So we have that based on the

23      defendants' own records, your Honor.

24             THE COURT:  Okay.  Let me focus on again another

25      stumbling block I see to granting the motion.  And that is

1    the argument that the plaintiff you've chosen is an

2    inadequate class representative and that her claims are not

3    typical of the putative class.

4           It's interesting to me that you focus on the people

5    that have been injured in part to lay a foundation for the

6    Court that this is a hazardous product, but the class

7    wouldn't include any of those people that have been injured.

8    It's not that type of lawsuit.  So at one point you use those

9    people, but the other point is they're not going to be

10   members of the class.

11          Setting that aside, the defense argues that class

12   representatives may not simply lend their name to a suit

13   controlled entirely by the class attorney, and that in this

14   case there is no typical claim or experience, and certainly

15   not the plaintiff's experience that can be extrapolated

16   classwide.

17          And obviously I decided the summary judgment motion.

18   I decided not to grant summary judgment.  But in that summary

19   judgment order, I included a finding based on the deposition

20   that your client gave in which she clearly indicated that she

21   didn't buy this stroller for any other reason other than that

22   it was inexpensive.  The fact is that she used the stroller

23   for 18 months.  And at least her testimony is but for her

24   discussion with her uncle, she probably would have continued

25   to use this stroller.  Specifically, I said Sanchez bought

1    the stroller not because of supposed misrepresentations by

2    Wal-Mart regarding the stroller's safety but because it fit

3    her budget and was small, yet you put her up now and submit

4    declarations from her in which -- and look, everyone in this

5    the courtroom knows that it's the lawyers that write the

6    declarations.  It's not Ms. Sanchez that wrote that

7    declaration.  I understand she signed it, and she did so

8    under penalty of perjury, and she attested to it.  But it's

9    not her words, and it's not her opinion, at least I find it

10   difficult to believe that she understands much of what's in

11   that declaration.

12        Now, you criticized the defense saying they're being

13   over-technical, they're being over-legal, it's unfair to her.

14   But I look at her, and I don't see her as being the type of

15   person as a matter of law that should be the class

16   representative.  And it does seem to me, and it's argued over

17   and over again, that this is a case of what I call the tail

18   wagging the dog.  It's a case where, as the defense argue,

19   that the only person that's likely to benefit from a class

20   action in this case are class counsel, and costly and

21   time-consuming class action is hardly the method that should

22   be used in this case.

23        She's not a great representative.  And I'll give you a

24   chance to convince me otherwise.  When I say that she's not a

25   great representative, as a matter of law I don't think she

1    qualifies as the class representative.  I would have thought

2    that maybe her uncle would have been a better class

3    representative.  But again, you've decided to pursue an

4    economic remedy, not a remedy based on injury.  But I look at

5    this case and I agree at this point with the defense that the

6    only people that are going to benefit from this type of class

7    action are the lawyers, and this is without doubt a lawyer

8    driven class action.

9           I'll give you a chance to respond to that.

10          MR. RAM:  Thank you, your Honor.  Starting at the end,

11   they're selling strollers that are slicing people's fingers

12   off.  And as I said, there's no way it's just 17 people.

13   That I expect, based on my experience in other cases, is the

14   tip of the iceberg.  But they're selling strollers that are

15   slicing people's fingers off.  And our class representative

16   testified at length in her deposition that she would like

17   that to stop, that she was doing that for the benefit of the

18   class.  She would like it to stop.  As I said --

19          THE COURT:  Well, I know she said that.  And I want to

20   respond to that.  But I understand that Mr. Wolden

21   represented her uncle.  Am I correct in that?

22          MR. WOLDEN:  Yes.

23          THE COURT:  It just seems apparent to me that she then

24   discusses her case with Mr. Wolden.  And again, I understand

25   that both of you truly believe in this case.  And I don't

1    mean this to be disparaging in any way, but I'm focusing on

2    who's really driving this lawsuit.  And I can imagine a

3    discussion, not invading attorney-client privilege, but a

4    discussion between Ms. Sanchez and attorneys in which the

5    attorneys are saying to her no, no, you're a perfect

6    representative for the class.  And this is, in effect, what

7    defendants are implying.  You should be the class

8    representative.  I think we've got a great class action.

9    It's not her saying -- and the facts are she didn't get

10   injured in any way.  She's admitted she bought the stroller

11   only because it fit her budget and it was small.  She used

12   the stroller for 18 months.  She would have continued using

13   the stroller but for the fact that her uncle got hurt,

14   contacted Mr. Wolden, and then she decided to put it away.

15          Add to all that the fact, as the defendants argue,

16   that her claim alone is going to raise a number of individual

17   issues in terms of did she, in fact, buy it at Wal-Mart, what

18   warnings did she receive, because she's thrown away all the

19   documents that she received.  So there are, again just

20   focusing on her, individual issues and defenses that are

21   going to be raised by the defendants that are specific only

22   to her.  And that, again, as the defendants argue, cuts

23   against certifying this as a class action.

24          Go ahead.

25          MR. RAM:  Your Honor, let me address her experience

1    and why I think she is typical.

2              THE COURT:  Go ahead.

3              MR. RAM:  The defendants' brief reads as if this case

4    were about a stroller that says affirmatively will not cut

5    off finger if you put it in the hinge point, an affirmative

6    representation.  That's not what this case is about.  This

7    case is about an omission.  And the evidence that we're aware

8    of shows where did they make that omission?  Everywhere.  To

9    whom did they make that omission?  To everybody.  When did

10   they make that omission?  All the time.  Her experience is

11   typical.  And again, I have to --

12             THE COURT:  But she didn't buy the stroller and

13   there's -- how do I put this.  The argument that she makes

14   now that I wouldn't have bought the stroller or wouldn't have

15   purchased the stroller had the warnings been disclosed is

16   undermined by her statement, affirmative statement, that I

17   bought the stroller because it fit my budget and it was

18   small.

19             MR. RAM:  Well, I respectfully disagree, your Honor.

20   Again, I have to go back to the Chamberlan case.  People buy

21   cars who like Fords.  They don't buy them for the water

22   crossover in the intake manifold.  They buy them because of

23   their budget, or the gas mileage, or they look nice, or they

24   think that they're what their family needs.  And the court

25   addressed that in one of the Chamberlan cases.  I believe

1    it's in the briefing.  We could get it for you.  And said

2    that's not really the question.  Nobody goes in thinking

3    well, is this water crossover going to fill?  The question is

4    does everybody have certain reasonable expectations that are

5    not being met?  So yeah, people buy for price.  Everybody

6    buys for price.

7            THE COURT:  But again, nothing happened to her though.

8    Isn't that a significant fact?  In the 18 months that she

9    used this stroller, absolutely nothing happened to her.

10           MR. RAM:  Well, what happened to her is her uncle told

11   her I hurt myself on this stroller and so she stopped using

12   it.

13           THE COURT:  I'm not focusing on her uncle.  I'm

14   focusing on her.

15           MR. RAM:  What happened to her is she had to stop

16   using it because she believed reasonably, we think, that it

17   was unsafe.

18           THE COURT:  But she wasn't injured during the

19   18 months that she used it.

20           MR. RAM:  She was injured economically --

21           THE COURT:  Whether you agree with that, we're sort of

22   getting off the issue, and I know you don't agree with that,

23   but the more important issue for purposes of this motion is

24   that's an individual issue.  That's an issue that they're

25   going to raise and they have to raise in defense of this case

1    with her.  And what they argue is because they have to do

2    that, because the defense has to do that, a class action

3    isn't the proper course to take in this case.  That it's not

4    the best course to take.  And you know that one of the

5    elements is that the class action has to be the superior

6    method for a fair and efficient adjudication of the

7    controversy.

8              What defense argues is if I certify this class, I take

9    away the fairness.  And we can argue efficiency because I

10   think class actions, in general, are probably more efficient.

11   But it's this fairness issue that's concerning me.  And I

12   just read off at least nine things that they raised that

13   require individual determination.  And the argument is,

14   judge, you're taking away our right to present a fair defense

15   if you certify this class.  You make an individual case

16   that's very, very weak if she came into this court and tried

17   this case alone.  It's not a great case for her because of

18   all these other factors.  And so the argument is we need to

19   do that with every individual they want to make a member of

20   this class, and we can't do that if you certify this class.

21   We can do it on an individual basis obviously, but we can't

22   do it, and I've got to take that into consideration before I

23   grant a motion to certify the class.

24             Do you agree with that, that the fairness is an issue?

25             MR. RAM:  Yeah, I agree that fairness is an issue,

 1    your Honor.  I think it's also fair that you think about the

 2    consumer that pays $20 for a product, a dangerous product we

 3    allege and we would show, getting squished by a defendant who

 4    violated their own standards and who can pay $200,000 or

 5    whatever for experts to come in and say essentially what they

 6    want them to say.

 7          And I think the Court has to think about fairness

 8    there in terms of does it make sense to level the playing

 9    field and decide it in one class action.  Our class

10    representative suffered what everybody else in that class

11    suffered.  And this is under the Trew vs. Volvo case here in

12    this district.  They paid more than they would have paid had

13    the defendants disclosed what a reasonable consumer would

14    have expected them to disclose about the danger.

15          THE COURT:  Mr. Meyer.

16          MR. MEYER:  Yes, sir.

17          THE COURT:  Anything further you want to add?

18          MR. MEYER:  I don't think so, your Honor, not unless

19    you have any other questions, sir.

20          THE COURT:  Mr. Wolden and Mr. Ram, anything further

21    you want to add with respect to the motion?

22          MR. RAM:  I'd also ask the Court to remember that we

23    have a claim for injunctive relief.

24          THE COURT:  Okay.  Both lawyers are silent.  I'm going

25    to take the matter under submission.  I will issue a written

1    opinion both on the motion to strike and on the motion to

2    certify the class.  I also give both sides fair warning.  You

3    are well aware of the fact, though if you're not, I will

4    inform you that we reached, this district, the unhappy

5    distinction of being the busiest district in the country.  In

6    fact, the caseload per judge as of December 31st, 2008, was

7    1,004 cases per judge, which is more than twice the average.

8    All that is a predicate for saying I'm not going to get this

9    out next week.  I'll get an opinion out to you as soon as I

10   can, but it may be at least 30 days.  And if it's going to

11   take longer, I will notify you.

12        I know that it always bothered me as a lawyer when

13   judges sat on motions because you need to plan your lives.

14   And I'm well aware of that.  And I'll try to do this as

15   efficiency and quickly as I can so both sides can plan the

16   course of action that this case is going to take.  But I just

17   wanted to be up front with you that we're swamped right now,

18   and so we'll do what we can.

19        I also am not bothered by the fact, and lawyers are

20   always reluctant to do this, I always was, to contact, if you

21   want to contact Mr. Vine and just say:  Where do you think

22   he's at?  When do you think he'll get it out?  That doesn't

23   bother me at all.  And so don't hesitate to do that if you

24   think you need to speed it up a little.  It doesn't bother me

25   at all.  I'm well aware of the significance of cases like

1    this and that we need to do what we can.

2             Okay.

3             MR. MEYER:  Thank you, Judge.

4             THE COURT:  Thank you both.

5             MR. WOLDEN:  Thank you, your Honor.

6             MR. RAM:  Thank you, your Honor.

7             (Proceedings concluded at 11:17 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                I certify that the foregoing is a correct transcript

2      from the record of proceedings in the above-entitled matter.

3

4

5                              /s/ Kelly O'Halloran

6                              KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25